**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Paul W. PANCZKO, Defendant-Appellant.**

**No. 15028.**

United States Court of Appeals Seventh Circuit.

Nov. 29, 1965.

Rehearing Denied Dec. 21, 1965.

Melvin B. Lewis, Chicago, Ill., Joseph A. Varon, Hollywood, Fla., for appellant, Julius Lucius Echeles, Chicago, Ill., of counsel.

Edward V. Hanrahan, U. S. Atty., John Peter Lulinski, Asst. U. S. Atty., Chicago, Ill., for appellee, John Powers Crowley, Asst. U. S. Atty., of counsel.

Before HASTINGS, Chief Judge, and DUFFY and SCHNACKENBERG, Circuit Judges.

SCHNACKENBERG, Circuit Judge.

Paul W. Panczko, defendant, appeals from a judgment of the district court sentencing him to a term of 10 years and fining him $500 and costs, following his plea of not guilty of violation of

§ 1704, Title 18 U.S.C. as charged in an indictment. There was a jury verdict finding him guilty.

§ 1704 provides, in part:

Whoever steals, purloins, embezzles, or obtains by false pretense any key suited to any lock adopted by the Post Office Department and in use on any of the mails or bags thereof, or any key to any lock box, lock drawer, or other authorized receptacle for the deposit or delivery of mail matter; or

Whoever knowingly and unlawfully makes, forges, or counterfeits any such key, or possesses any such mail lock or key with the intent unlawfully or improperly to use, sell, or otherwise dispose of the same, or to cause the same to be unlawfully or improperly used, sold, or otherwise disposed of; * * *

\* \* \* \* \* \*

Shall be fined not more than $500 or imprisoned not more than ten years, or both. * * *

1. A jury, consisting of eight women and four men with two alternate jurors, was selected, and sworn on December 9, 1964. Trial commenced on December 10, 1964, when the first witness was called. The case was submitted to the jury for decision on Monday, December 14, 1964, at 4:30 P.M.

At 10:30 P.M. on the same day, the court announced that he was about to permit the jurors to "go to their respective homes, with the admonition that they, of course, speak to no one about the case or read anything about it, not to discuss it with anybody until they return to discuss it with their fellow jurors in the morning * * * well they can come back here at 9:30."

Thereupon defense counsel stated that defendant objected to the jury being permitted to separate.

The court then had the jury brought before him and, by interrogation of the foreman, elicited his opinion that it did not look like a unanimous verdict would be arrived at "tonight". The court then

stated that the jurors were not to read anything or listen to anything about the case or discuss it with anyone. He thereupon dismissed them until 10 o'clock the following morning.

One of the women jurors requested that someone take her to the train depot. As to another woman juror, the marshal told the court that he understood "she lives in Joliet and I think the last train has already gone". A male juror volunteered that there were some trains "between 12:15 and 1:15 that we could catch, if anybody were headed in those directions".

A woman juror stated: "I have to take the Northwestern [Railroad] up to the northeast corner of the state, north of Waukegan * * * I have my car parked down by the railroad track in Waukegan and I drive seven miles from there. It is down in the desolate—" The court interrupted her saying "You can catch your train, I mean, you can get a train?" She answered "Yes".

The court then proceeded to question a male juror who said he would take the subway, and a woman juror said that she could "get the train".

The next woman juror answered by saying that she would take the bus "if I know where I am going". The court clerk volunteered that "The lady takes the Lake Street L".

The court said to a man who intended taking the elevated road home: "All right. You can accompany one of the girls to the elevated. This is one of the obligations of citizenship and we all do the best we can".

Thereupon a bondsman in the courtroom volunteered to drive a juror to Oak Park, but this offer the court declined.

On December 15, 1964, the jury was brought into court and delivered its verdict finding the defendant guilty.

Defense counsel point out that, although the court admonished the jury not to read anything about the case, or listen to any radio or television commentaries or discuss the case with anyone except follow jurors, the court made

no inquiry of the jurors upon their return the following morning as to whether any of them had read several newspaper articles which appeared, whether they had heard any broadcasts, or whether anyone, member of family or otherwise, had made any comment upon the case and prejudicial matter which defense counsel contended had appeared in two newspapers.

On February 9, 1965, in United States v. D'Antonio, 7 Cir., 342 F.2d 667, petition for rehearing *en banc* denied April 9, 1965, we held it was error to permit a jury to separate during its deliberations, over the defendant's objections.

In D'Antonio, at 670, we said:

"At no time is it more essential that the jury should be immunized from outside influences than when it is engaged in deliberating upon what its verdict is to be. During that critical period, when the jurors are engaged in resolving vital issues between the government and the defendant, the judge certainly should not relax the traditional safeguards against outside intrusion. Dispersement into the city at night of a group of men and women who have been deliberating in the security of the courthouse subjects them to the risk of being individually importuned, if not threatened, by telephone calls or personal contacts."

Of course the district court, in the case now before us, did not have before it our decision in D'Antonio which had not yet been rendered at the time of the trial in this case. However, the principles which we recognized in D'Antonio had long existed and were binding upon the district court in the case now being reviewed. The facts in the record in the case at bar as to the separation of jurors at a late hour at night, leaving each to find the way to his or her respective home, merely further emphasizes the need for applying the established rule which we later reiterated in D'Antonio.

■ We hold that the failure by the court to sequester the jury overnight during its deliberations had a two-pronged effect, first, of exposing the released jurors to exposure to those who might, by printed or spoken word, attempt to influence their official action, and secondly, imposing upon the jurors, especially the women, unnecessary and serious inconvenience. Illustrative of the latter is the mental state of the woman juror who was obliged to go from the courthouse to a railroad station in Chicago at a late hour at night and take a train to a point not far from the Wisconsin-Illinois state line, where she planned to disembark and seek her car parked by the railroad track and then drive seven miles in what she started to describe as "the desolate—" (evidently she was interrupted in making her statement in court). Moreover, she was required to leave her home early the following morning, drive her car to the railroad track and then take a train to Chicago. Thus deprived of a normal period of rest during that night, she was called upon to decide the fate of the defendant on the following morning.

■ Not only was the treatment accorded the jury in this case unfair to the defendant, but it was violative of the rights and comfort of the jurors themselves. The jury is an important part of the administration of justice. Jurors are entitled to the court's respect and protection. A duty rests heavily upon a trial judge to see that the ability of a juror to perform his or her important function of deciding on the guilt or innocence of one charged with crime shall not be diminished or thwarted by unnecessary exposure to the discomfort, improper influence or, especially, personal danger after a jury has commenced deliberating upon its verdict.

In the case at bar, we hold that the district court erred in ordering the jury to separate during its deliberations, especially over defendant's objections. This requires a reversal of the judgment below and a remandment for a new trial.

2. Because this case may be retried in the district court, we will dispose at this time of a point raised by defendant which may again arise upon a new trial.

On the trial in the district court the government produced certain keys marked Government Exhibit 1 and it now contends that the evidence which it there introduced sufficiently identified those keys as those claimed to have been illegally possessed by defendant on April 11, 1963, as alleged in the indictment.

Defendant's counsel insist that proof of "similar" appearance of the keys received in evidence is not sufficient to justify a conviction. They point out that the keys which a boy (Michael McGarr) found were given to a policeman, and that Gerald Esposito, a police officer, testified he got a set of keys from one of the boys at the scene, but he did not know the latter's name. While stating that the keys in evidence were "similar" to the keys which the boy gave him, he was not prepared to state that they were the keys which the boy handed to him that day.

Defendant's counsel charge that there is no proof in the record that the keys which the McGarr boy found and gave to a policeman were the same keys which officer Esposito testified he got from a boy. However, we are not required to say, on the evidence, that the jury might not have been justified in drawing an inference that both McGarr and officer Esposito were testifying about the same keys. But, to go a step further, there is no proof in the record showing that those keys were actually the keys [1] introduced in evidence as Government Exhibit 1. Officer Esposito testified that after he got the keys he gave them to the *chief of police* in the police station. While Officer Esposito testified that the keys in evidence were *similar* to the ones which the boy gave him, postal inspector Jacobs testified that those keys were in his custody and control from April 11, 1963, when he got them *from* Lieutenant Remkus, to the date of the trial. There is no evidence as to where or from whom Lieutenant Remkus got the keys. He did not testify. It does not appear in the record that Esposito gave any keys to Lieutenant Remkus. As we have said, Esposito gave the keys to his chief of police, who also did not testify.

On a retrial of this case the handling of the keys allegedly thrown away by defendant should be traced by an unbroken chain of evidence.

For the reasons herein stated, the judgment from which this appeal was taken is reversed and this cause is remanded for a new trial.

Judgment reversed and cause remanded for a new trial.

DUFFY, Circuit Judge (concurring in the result).

Consistent with our decision in United States v. D'Antonio, 342 F.2d 666, we must hold that it was reversible error to permit the jury in this case, over the objections of the defendant, to separate during its deliberations.

The trial of the instant case was prior to our decision in D'Antonio. Upon inquiry, the District Judge who presided in this case, learned that several of the District Judges in the Northern District of Illinois, Eastern Division, had adopted the practice of permitting a jury in a criminal case to disband for the night, after the case had been submitted to them by the Court.

I do not agree with the statement in the majority opinion that the treatment of the jury in this case was violative of the rights of the jurors themselves; nor do I think the inference is warranted that the action of the trial judge in this case may have diminished or thwarted the jury from functioning properly by unnecessary exposure to discomfort.

Jury duty is an important duty of citizenship. The performance of such duty may often interfere with the juror's comfort and convenience. Such duty may conflict with previously made plans for engagements.

Neither of the parties to this lawsuit has complained or made an issue of the treatment accorded to members of this

---

[1]. We observe from a physical examination that each of these keys bears an identifying number.

jury. As far as the record shows, no member of the jury has complained. What is shown is that the jurors were willing to make great effort to reach their respective homes after the jury was permitted to separate.

At the late hour when it became apparent that a jury verdict would not be reached, it was in the discretion of the trial judge as to how best to handle a difficult situation. I am unable to say there was an abuse of discretion in this respect.