**Frank M. RICH, Petitioner,**

v.

**UNITED STATES of America,
Respondent.**

**Civ. A. No. 989.**

United States District Court,
E. D. Virginia,
Newport News Division.

Jan. 5, 1967.

Arthur Lambiotte and Philip L. Avis, Newport News, Virginia for petitioner.

James A. Oast, Jr., Asst. U. S. Atty., Norfolk, Virginia, for respondent.

## MEMORANDUM

WALTER E. HOFFMAN, Chief Judge.

This is a motion under 28 U.S.C. § 2255 seeking to set aside and vacate a sentence of life imprisonment imposed upon petitioner on May 22, 1958, following a jury trial on the charge of kidnapping involving the transportation of the victim from Virginia to Maryland and the inflicting of serious bodily injuries upon said victim.

In his 94 page motion it appears that the vast majority of the points presented are either frivolous or have otherwise been effectively determined by petitioner's direct appeal from his judgment of conviction and sentence. Rich v. United States, (4 Cir., 1958) 261 F.2d 536, cert. den. 359 U.S. 946, 79 S.Ct. 731, 3 L.Ed.2d 678. A discussion of the many issues presented is contained in a prior eleven page memorandum filed in the present proceeding on March 17, 1964, to which reference is hereby made.

It has admittedly been a difficult matter to bring this case to its final stage. Petitioner expressed dissatisfaction with his two court-appointed attorneys designated to represent his interests on the motion. A third attorney was then added and, subsequently, one of the three attorneys moved away from the area. One of the two remaining attorneys was granted leave to visit the petitioner at the United States Penitentiary, Leavenworth, Kansas, for the purpose of conferring about the case.[1] During the

---

1. The expense of this trip was authorized by the United States Court of Appeals from funds available to that court.

pendency of the proceedings the petitioner, acting *pro se*, sought his release on bail. When this motion was denied, petitioner appealed *pro se* and the appeal was dismissed as frivolous by order of the United States Court of Appeals dated January 20, 1966.

On March 30, 1966, counsel for petitioner advised the Court as to the grounds for the motion deemed worthy of merit. A pretrial conference order, endorsed by counsel, was entered on June 8, 1966, confining the hearing to four issues, to-wit:

1. Was court-appointed counsel inadequate in the defense of Frank M. Rich during his trial before the jury?

2. Was there an adequate proper record upon which an appeal could have been taken in a capital case?

3. Was the defendant prejudiced by permitting the jury to separate both during the trial and during the deliberations [2] since this was a capital case?

4. Did the Court err when questioning the jury on their voir dire?

On July 23, 1965, the Court conducted a partial plenary hearing,[3] at the request of petitioner's counsel, for the purpose of interrogating the eleven surviving members of the jury to ascertain any possible misconduct on the part of the jurors in connection with reading any newspaper accounts of the trial during the three day trial or in any manner conferring with others during said trial, and for the further purpose of confirming what the trial record already indicated[4] to the effect that the jurors had been permitted to disperse during luncheon recesses, overnight, and for a luncheon recess after deliberations had commenced.

## THE EFFECTIVENESS OF TRIAL COUNSEL

On September 13, 1957, when the petitioner was initially brought before the Court, attorneys Luther W. White, III and William A. Redfern, Jr., both having previously served as Assistant Commonwealth's Attorneys for the City of Norfolk, were appointed to represent petitioner. At that time petitioner was serving a federal sentence at the United States Penitentiary, Lewisburg, Pennsylvania, for a narcotic violation. On October 27, 1957, petitioner appeared with Mr. Redfern for arraignment, at which time he entered a plea of not guilty and requested trial by jury. The case was set for trial before the Honorable Albert V. Bryan on November 20, 1957.

On November 11, 1957—nine days prior to trial—Messrs. White and Redfern requested leave to withdraw as counsel. The attorneys could not, consistent with their obligation to their client, reveal the reason for such request. In the interim, Mr. White, at his own expense, had visited the Atlanta Penitentiary to interview petitioner's alleged accomplice, McNabola. Mr. Redfern, at his own expense, had gone to New York for reasons unknown to the Court. According to the record, petitioner knew the reason why his counsel felt compelled to withdraw. An order was entered permitting Messrs. White and Redfern to withdraw; the case was continued; and thereafter Dudley Cocke and Daniel H. Payne were designated as counsel. It is these two attorneys whom petitioner now attacks as ineffective.

---

2. The language "during the deliberations" is a poor choice of words. The jurors had commenced their deliberations and, after approximately one hour, they were permitted to separate during a luncheon recess. They thereafter reconvened and resumed their deliberations until the verdict was returned.

3. Petitioner expressed a desire to be present at this hearing. The Court denied this request as the inquiry was confined to the interrogation of jurors.

4. In the opinion of Judge Sobeloff on the direct appeal, it is indicated that the jury "did not disperse" at lunch time. This is obviously an error as the trial record clearly reveals.

On March 4, 1958, pursuant to a motion for change of venue, Judge Bryan ordered the case transferred to the Newport News Division by consent of the parties. Subsequently the case was heard at Newport News on May 20, 21, and 22.

At the outset of the trial, and prior to the voir dire examination of the jurors, Mr. Payne requested that the witnesses be excluded from the courtroom "because [of] the nature of some of the questions on voir dire to be propounded to the jury". This comment is significant as it serves to answer, in part, the petitioner's attack upon the alleged error of Judge Bryan in questioning the jury on the voir dire. Mr. Payne's request was granted. The voir dire examination will be hereinafter discussed. Upon the completion of the voir dire examination the jury and two alternates were selected.

An examination of the transcript, which contains the opening statements of counsel, reflects that petitioner contended that he was in Baltimore at the time the crime was committed in Onancock, Virginia, and which thereafter resulted in the victim's being transported across the Virginia-Maryland line. In fact, Mr. Cocke told the jury that petitioner would "show you that he was in Baltimore, within an hour or an hour and a half prior to the time that this crime against Sheriff Davis was committed".

Since petitioner's contention was that he was in Baltimore at the time the crime was committed, it was unnecessary to cross-examine certain witnesses. The first witness connecting petitioner with the crime was the victim, Deputy Sheriff Warner Thomas Davis. Petitioner was identified as being the driver of the automobile which carried Davis across the state line.[5] The extensive cross-examination of Deputy Sheriff Davis by Mr. Payne consumed a total of 46 pages of the transcript. A vigorous attack was made of Davis' identification of petitioner.

The second witness connecting petitioner with the crime was Michael Botto, a confessed co-dealer with petitioner in handling narcotics. According to this witness, petitioner visited Botto's home in the late summer of 1956 and related to Botto the attempted safe-cracking of a supermarket in Virginia, the surprise visit of a sheriff, the assault, and the subsequent transportation of the sheriff to Maryland. Petitioner, according to Botto, named McNabola and one Joe Celso as his accomplices. While the cross-examination of Botto was limited to 6 pages, it is significant that Mr. Payne brought out Botto's extensive criminal record and the fact that Botto was jointly indicted with petitioner and others on a narcotic charge and was placed on probation after testifying against his co-defendants.

The third and final witness connecting petitioner with the crime was a young girl, Debbie Sajour.[6] She testified that she rode with Rich on a motorcycle from New York to Baltimore on a Friday afternoon in the late summer of 1956. They stopped at a motel in Delaware on Friday night and continued their trip the next morning, arriving in Baltimore around 11:00 A.M. on Saturday. They waited in front of a house and, in a short while, a car occupied by "Mac" and "Joe" drove up. The girl and the men entered the flat and, later that afternoon or evening, the three men left. Petitioner told the girl to wait; that they would be back "late". They returned between 3:00 A.M. and 4:00 A.M. on Sunday morning. The girl, who wanted to re-

---

5. McNabola was identified by Davis as being the driver of the car when it crossed the state line. The three criminals had apparently run out of gasoline and, after leaving the car and obtaining gasoline, McNabola later drove and petitioner was in the back seat with Davis.

6. This witness was 16 at the time of the crime and 17 when testifying. She was formerly Debbie Young and thereafter married.

turn to New York where she was employed, inquired of petitioner whether they were going back Sunday night, to which petitioner replied, "No, we're not because we're not finished, and we'll have go out again tonight". The three men slept most of the day on Sunday and left again Sunday night. The crime was committed on Sunday night. It was daylight on Monday when the three men returned. The witness testified that, before leaving New York, petitioner told her that the purpose of the trip to Baltimore was "to get some money". The three men and the girl remained in Baltimore and left on Tuesday in "Joe's car", arriving in New York around 10:00 P.M. The cross-examination of this young girl consisted of 7 pages, but Mr. Cocke ably brought out the fact that the girl had testified at petitioner's narcotic trial, and that she and the petitioner slept in the same room in the Delaware motel and in the Baltimore apartment, with the girl denying that they slept in the same bed (a factor that is bound to have impressed the jury as to the lack of credibility of this witness). The prosecution then rested its case in chief.

The petitioner was the first witness in his own behalf. He, of course, denied being in Virginia and explains his absence from the Baltimore apartment by saying that he was to meet another girl by the name of Bonita Tatum who had, according to petitioner, come to Baltimore to meet a cousin. He also related his drinking episodes over the weekend in question, including reference to a girl named Rita. Petitioner conceded that he dealt in narcotics and claimed a partnership with Michael Botto. In fact, he stated that the earnings of the partnership ran "up to twenty-five hundred dollars a week". Petitioner also described the "lineup" in New York, at which time Deputy Sheriff Davis was present. He likewise referred to certain events at the hearings before the United States Commissioner in New York. He explained his breach of friendly rela-

tions with Botto and stated that Debbie Young was provoked at him because he would not permit her to live with him. He stated that Mr. Payne or Mr. Cocke finally located Bonita Tatum,[7] even though he claims not to have known her last name until she was found by the attorneys. The thorough direct examination of the petitioner required 41 pages of the transcript.

Petitioner testified further that he met Bonita Tatum in Baltimore at 8:30 P.M. on Sunday night—approximately 1½ hours prior to the attack upon Deputy Sheriff Davis. They separated a few minutes thereafter. Bonita Tatum was subsequently called as a witness by petitioner and denied having gone to Baltimore in August, 1956. As Mr. Payne had apparently interviewed this witness in January, 1958, in New York, he claimed surprise and, while the jury was excused, conducted an extensive cross-examination as to what the witness had said to Mr. Payne. When the jury was recalled only one further question was asked which indicated that this witness was reluctant to testify for fear of incriminating herself.

Only one other witness testified for petitioner. This witness was a fellow-inmate with petitioner who allegedly was one of 10 to 15 persons in the New York lineup.

McNabola, petitioner's accomplice, was brought to the trial at Newport News from the Atlanta Penitentiary, same being at the request of petitioner. He was not called as a witness.

■ One cannot review the voluminous trial record without arriving at the conclusion that petitioner not only had effective representation, but he in fact had excellent representation by counsel. The theory of the defense was, as Mr. Cocke described in his closing argument, that petitioner was a prosperous dealer in narcotics, realizing $1250.00 per week ($2500.00 per week for the partnership with Botto), and that there was no mo-

---

7. Bonita Tatum, according to petitioner is colored. Petitioner is white. This is pertinent in considering the voir dire examination of Judge Bryan.

**954**

tive for petitioner to go into Virginia "to rob some two-bit supermarket of a few hundred dollars". That the witness, Bonita Tatum "backfired" is no fault of petitioner's counsel. Perhaps the best expression of the able services of trial counsel emanated from Judge Bryan at the conclusion of the trial when he said:

> "Adjourn, Mr. Marshal—before you adjourn, Mr. Payne and Mr. Cocke, let me say to you how much the Court appreciates your services. It is very, very evident that you have given a lot of study to this case and given it every consideration and attention that is possible. You have devotedly undertaken and pursued this assignment, and it is very evident that you have been dedicated and consecrated in performance of your duty, and I just wish that the Court could express itself more substantially, but I could not do so more deeply than I do."

With great respect for the attorneys appointed to represent petitioner on his motion filed under 28 U.S.C. § 2255, the Court is of the opinion that petitioner's present counsel are serving as Monday Morning Quarterbacks in criticizing petitioner's trial counsel. It is, of course, their duty to urge the ineffectiveness of trial counsel for the Court's consideration. When petitioner's case reached the United States Court of Appeals on his direct appeal, the principal contention assigned was the denial of effective assistance of counsel. Judge Sobeloff's opinion states on this point:

> "We are convinced that the defendant had the benefit of adequate counsel, both in the District Court and on appeal; that the Court-appointed lawyers have conscientiously and competently done the best they could to present every reasonably available defense and contention."

The foregoing statement suggests that the undersigned judge has perhaps invaded the province of his superior court in even again considering the effectiveness of trial counsel. However, neither the petitioner nor his trial counsel testified with respect to what was done—or not done—by the attorneys, and the Court of Appeals was basing its opinion upon the trial record, together with statements made in briefs filed in the appellate court. As a plenary hearing was required by reason of certain allegations contained in the 94 page motion, and as these allegations justifying the granting of a plenary hearing were apparently interlocked with the claim of ineffective counsel, the district court concluded that a more searching inquiry would be appropriate. The plenary hearing involving all issues other than the alleged jury influence was conducted on July 27, 1966. Even after a period of more than 8 years—while the memories have undoubtedly been dimmed—the three participating attorneys (including the prosecutor) were able to give the benefit of their recollection of certain events. Both defense attorneys testified that they discussed at length with petitioner all phases of trial strategy and Mr. Cocke expressed the belief that they went over the voir dire questions, admittedly unusual, with petitioner. The prosecutor stated that the voir dire questions were the subject of a conference with Judge Bryan in open court with petitioner present, although this conference may have been a sidebar discussion. Petitioner now states that his counsel never consulted him with respect to the voir dire questions, but it is significant that the jurors were examined on the voir dire in groups of six, all in the presence of petitioner, and he never indicated any objection to the now-contended prejudicial voir dire questions. The Court finds that trial counsel did confer with petitioner, in advance of trial, as to the nature of the voir dire questions to be asked of prospective jurors, and that the petitioner had knowledge as to the contents and reasons for same.

Petitioner testified that he requested his counsel to ask Judge Bryan "to keep the jury together". He does not remember when he made such a request. Again it is significant that he made no objection during this three day trial to the jury being permitted to dis-

perse, with the first separation being at the lunch hour on the first day of trial. He does not claim that he made this request of counsel during the trial. As hereinafter indicated, the matter of permitting the jury to separate is largely discretionary, even in a capital case. Many able defense attorneys do not want a jury kept together as it tends to over-emphasize the importance of the case and the possible guilt of the defendant on trial. In the absence of statute or a showing of prejudice, it is a matter of trial strategy which would, in any event, fall within the judgment of counsel. The Court does *not*, however, find that petitioner ever requested trial counsel to ask that the jury be kept together.

The effect of petitioner's testimony at the plenary hearing is perhaps best demonstrated by petitioner's remark to the undersigned judge when questioned as to his allegations relative to the unfairness of judges evidenced by his many letters of criticism. Petitioner aptly described the situation by making a casual statement that all courts knew that he meant nothing by his vituperous statements. Stated otherwise, petitioner feels that since he is in custody, he has an inherent right to make any allegation or statement in order to obtain a release from custody. In fairness to the petitioner, he cannot be too severely criticized along these lines as the courts have done much to encourage such actions.

■ Finally, petitioner's present counsel asserts that the most glaring error of trial counsel "was to plan their whole defense along the line that Frank Rich was making so much money out of the sale of dope that it would be foolish to think that he would *need* to try to rob a supermarket and in process abduct a sheriff". Present counsel do not suggest what defense they would have advanced, but of even greater importance is the fact that attorneys for persons charged with a crime are not permitted to "frame" a defense; it is their duty to take the facts as given to them by their client and, within ethical bounds, give their client the benefit of their best judgment in the presentation of his defense including, of course, exerting their best efforts in behalf of their client during the trial. In every respect Messrs. Cocke and Payne fulfilled these requirements.

## ADEQUACY OF RECORD FOR APPELLATE PURPOSES

Since this point is not mentioned in the briefs, it may be surmised that this has reference to the fact that the trial transcript does not clearly show when the petitioner was present at various times such as (1) the hearing on petitioner's motion for change of venue, (2) the consideration by Judge Bryan of the questions asked on voir dire, (3) the consideration of the jury charge, and (4) any consideration as to whether the jury should be permitted to disperse or be kept together.

■ It is reasonably clear from this record that petitioner was not present during the argument on the motion for change of venue. This hearing, conducted on May 4, 1958, was at the request of counsel for petitioner before Judge Bryan. It resulted in a *consent* order to transfer the case from Norfolk to Newport News. Petitioner never registered any objection to the transfer and the case was not heard until approximately 75 days later. Petitioner's presence at the hearing of this motion was not required. No witnesses were heard. It was a procedural matter only.

■ While the record is not clear, it appears that the voir dire questions were probably considered by Judge Bryan in a sidebar conference in open court with the petitioner present, although it is possible that these questions were discussed in chambers prior to trial in the absence of petitioner. Before any voir dire questions were propounded, Mr. Payne requested that the witnesses be excluded because of "the nature of some of the questions on voir dire to be propounded to the jury". In any event, as heretofore found, petitioner knew the nature of the questions before the first group of jurors

were interrogated. Assuming arguendo that the questions were discussed in chambers in the absence of petitioner, the Court holds that his presence was not required under the circumstances. Admittedly, petitioner was present in open court when each group of jurors was interrogated.

The consideration of the jury charge was obviously in open court (T. 285), as evidenced by this statement by Judge Bryan:

> "Let the record show that the Court at the bench inquired of counsel for the Government and for the defendant if they had any special requests for instructions and both sides advised the Court that they did not have any such requests. The Court then outlined to counsel what it proposed to include in its charge and explained what principles of law would be given to the jury and just how the matter would be submitted."

The record is silent as to when, if ever, there was any discussion between Judge Bryan and counsel as to whether the jury should be permitted to disperse or remain together. In this situation we can only conclude that there was no discussion and counsel apparently relied upon Judge Bryan to exercise his own discretion in the matter. At this point it may be well to consider the case of Near v. Cunningham, 313 F.2d 929 (4 Cir., 1963), cert. den. 369 U.S. 862, 82 S.Ct. 951, 8 L.Ed.2d 19, where an *in chambers* agreement, in the absence of Near, was agreed upon by the court and counsel permitting the jurors to dispense with the customary admonition by the court. On a writ of habeas corpus Near proved that jurors mingled with spectators and heard prejudicial remarks. It is clear, however, that the basis of the final decision was grounded on the fact that prejudicial consequences resulted from the jurors' contact with spectators, some of whom were "hostile" to Near. In the later case of Root v. Cunningham, 344 F. 2d 1 (4 Cir., 1965), cert. den. 382 U.S. 866, 86 S.Ct. 135, 15 L.Ed.2d 104, the prior decision in *Near* was clearly de-lineated where the court pointed out that *Near* was not decided on the mere absence of the defendant, but rather from the consequences that flowed from it.

The record is replete with admonitions given to the jury by Judge Bryan. They will be hereinafter considered.

The Court holds that there was an adequate proper record upon which an appeal could have been taken in a capital case.

WAS THE DEFENDANT PREJU-DICED BY PERMITTING THE JURY TO SEPARATE BOTH DURING THE TRIAL AND DURING THE DELIBERATIONS SINCE THIS WAS A CAPITAL CASE?

It was this primary issue which prompted the Court to grant a plenary hearing, especially since the Court of Appeals had erred in its opinion by stating that the jury "did not disperse" at lunch time. Feeling that at the very least this error should be corrected, the Court permitted an inquiry as to possible prejudice.

At the outset we should examine the admonitions given by Judge Bryan to the jurors.

FIRST DAY—LUNCHEON RECESS—

"THE COURT: Ladies and gentlemen, you have now been selected as the trial jury for this case. Frequently in a case of this character the Court keeps the jury together until the case is concluded. The Court is not going to follow that practice in this case. But in lieu of it, is going to depend upon you to remain aloof from any contact about this case. Keep yourselves apart from it except what you hear in the courtroom. I ask you to follow that admonition with every caution and every circumspection. It is most important.

As I say, especially in a case of this character, where the Court has the authority and it is sometimes custom to keep the jury at all times. The violation of the admonition is so often and is generally entirely inadvertent and unconscious and unintentional, but it is just

as much of a violation and just as harmful, no matter what the purpose of the deviation. Do not discuss the case with anyone during any recess or during any adjournment. I ask you to abstain from reading about the case in the press, or listening to broadcasts of it, or any discussion of it even on television, if that should occur.

If you are in a group and someone begins a discussion of the matters before you do not hesitate at that time to say, "I am on the jury in that case. I cannot participate in any discussion nor can I overhear any such discussion, and I ask you not to discuss it in my presence." Just explain that. It is quickly understood and your position is made clear at once. If anyone insists upon discussing the case with you, report it to the Court immediately. I do not think anyone would intentionally pursue any such course, but if it does happen, do not hesitate to report it to the Court.

It is difficult to follow this caution because you will hear this case tried all day long, and the first thing on your minds when you leave the courtroom is the case, going to come right to your tongue. You just can't help it, unless you are particularly careful about it. You are just bursting to say something about it, and it is awfully hard to restrain that impulse.

Now it is particularly desirable that you be careful and guard against any comment about the case or any part of it, what you think of this, this witness or that witness, or something jocular that may have occurred in the witness' testimony, or what you think about the case. It is not only dangerous by reason of its spread to other persons, but your comment may cause another juror to begin to think about that particular part of the case, maybe give it undue emphasis, or he may begin to allow his opinion on the case or that part of it to jell, become fixed, and it takes a very unusual man to change his mind after he has come to some opinion on the case or some feature of it. It is just a very difficult thing for a human being to do,

so follow that admonition and I think we will gain the same end that is sought when a jury is, as you call it, locked up.

So be very meticulous in that, if you will, so that we may not even have an appearance of a departure from this course.

Now it is 1:15. Would 2:15 give you adequate time for your lunch, or would you prefer to make it 2:30? How do you feel about that? Some of you may be at a distance from Newport News and not know the eating places, or an hour may be sufficient. Any of you feel that it would not be ample time for you? All right.

Mr. Marshal, let the jury withdraw before anyone else leaves the courtroom, and let them get downstairs before anyone else does, to return at 2:15, and when you do return, ladies and gentlemen, will you go in this door and go upstairs to the jury room. You will find that that has been arranged for your reception. I think you will find it quite comfortable.

Let the jury withdraw and recess court until 2:15."

AT END OF FIRST DAY—

"THE COURT: Ladies and gentlemen, suppose we adjourn until tomorrow morning. I will ask you to report to the jury room at 9:45 in the morning, and we will resume session at 10:00 o'clock.

I do want to recall to you and emphasize, scarcely can overemphasize, the importance of your bearing in mind the admonition that the Court mentioned to you at lunchtime. I want to add to that this. The persons that you see here in the courtroom or any acquaintance you may have connected with this case may seem to you to be rather cool when they meet you in the corridor or in the courtroom or anything of that sort; I just want you to understand that there is nothing purposeful in that. It is simply that they feel an obligation as they know you feel an obligation to remain detached from each other. So do not let that in

any way appear to you as a personal affront or neglect.

If you will withdraw now and return tomorrow morning at 9:45".

### SECOND DAY—LUNCHEON RECESS—

"THE COURT: Ladies and gentlemen, I understand that counsel will need some additional time. I thought it might be well to just merge it in with the luncheon hour, save your waiting and expedite the trial. So suppose we recess now until 1:30, if that will give you sufficient time, and again I will remind you about the caution that I mentioned to you at the noon hour yesterday.

Mr. Marshal, let the jury withdraw and return at 1:30."

### AT END OF SECOND DAY—

"THE COURT: Ladies and gentlemen, at this time the Court will have to consider with counsel certain questions of law that may require a little while, and in the meantime it would mean that you would be penned up in the jury room. It is late in the afternoon, and to avoid unduly inconveniencing you, I think it would be well to adjourn you over now until tomorrow morning, and I will confer with counsel, if that becomes necessary, this afternoon. And we will be ready to resume without any delay to you first thing in the morning.

So if you will withdraw now and return at, I believe, 9:45, and we will take up again at 10:00 o'clock, bearing in mind again, particularly at this stage of the case, I impress upon you its importance, that you do not read the papers and do not listen to broadcasts or any television announcements about the case, and abstain from all discussion of it just as far as it is humanly possible to do so.

I will meet you in the morning at 10:00 o'clock."

### THIRD DAY—LUNCHEON RECESS— AFTER DELIBERATIONS HAD COMMENCED

"THE COURT: All right, gentlemen. At this posture of the case I cannot over-emphasize the importance of your following to the letter the admonition that I have heretofore mentioned to you. If you will observe that right to the word of it, then we will be assured that there is nothing that might appear to throw any question into the case."

Thus we note that the warnings to the jury were given by Judge Bryan on each occasion when the jurors were permitted to separate. Eight of the eleven jurors examined at the plenary hearing on July 23, 1965, testified that they did not remember reading the newspapers at all during the trial, and some of these jurors volunteered the information that Judge Bryan had warned them not to read the papers. Two jurors indicated that they probably continued reading the newspaper but did not recall reading any accounts of the trial. One juror remembered reading an article which mentioned the juror's name, but he was of the opinion that this was after the trial was concluded.[8] All jurors denied discussing the case with outsiders or third persons. Petitioner, when he testified, did not attempt to show that any juror had been improperly influenced.[9] An examination of the three newspaper articles fails to indicate any prejudicial comment, even if the accounts of the trial had been read by the jurors—a finding that this Court does not make in view of the lapse of more than seven years between trial and the time the jurors testified. The nearest point to any prejudicial comment ap-

---

8. According to the newspaper accounts introduced in evidence, the only item mentioning the names of the jurors appeared on the morning of the second day of trial. This gave a resume of the proceedings of the first day, including the names of the jurors. An examination of this article (even if read by a juror) discloses nothing that the admitted evidence failed to reveal.

Moreover, it is entirely possible that the newspaper articles were saved and read by the juror after the trial.

9. Petitioner's sister, Ruth Nuccitelli of Bridgeport, Connecticut, had written letters to the individual jurors on September 24, 1959. Three of these letters are in evidence in this proceeding.

pears in the news account on the morning of the third day of trial where it is indicated that a key witness, Bonita Tatum, did a "turnabout". However, what may have been a surprise to the petitioner and his counsel, as well as to the newspaper reporter, was undoubtedly an equal surprise to the jury. In fact, her reported comment, made in the absence of the jury, to the effect that she neither denied nor remembered her prior conversation with Mr. Payne could readily be construed as assistance to the defense if it had been read by the jury.

In the final analysis there is only one question to determine. Must a jury be kept together at all times during the trial of a capital case? Under Virginia law, as it existed prior to 1952, the statute provided in part (§ 19–188, Code of Virginia 1950):

"In any case of felony when the punishment may be death, the court in its discretion may permit the jury to separate, provided that no objection by either the Commonwealth's Attorney or the accused appears of record thereto; but no such objection shall be made by either the Commonwealth's Attorney or the accused in the presence of the jury."

Applicable to the date of petitioner's trial, it is significant to note that, in 1952, Virginia relaxed its rule further by merely providing that, in a felony case, a jury shall not be kept together "unless the court otherwise directs". § 19.1–213; Code of Virginia 1950, as amended.

We fully recognize that, if prejudice is shown, it is grounds for a new trial in any case where the jury is permitted to separate and the jurors have been subjected to outside influence. Near v. Cunningham, supra. This is equally true with respect to a civil case involving a *de minimis* amount.

Petitioner relies upon United States v. D'Antonio, 7 Cir., 1965, 342 F.2d 667, and United States v. Panczko, 7 Cir., 1965, 353 F.2d 676. These cases may be readily distinguished.

D'Antonio, decided by a divided court, leans upon the non-delegable duty of the judge to control the jury. There were no admonitions given to the jury by the trial judge during the trial or before they dispersed after they had been deliberating several hours. After the verdict was returned, the Court stated that he had told the Marshal to read to the jury, out of the presence of the Court a brief statement telling them not to discuss the case with anyone, nor permit anyone to discuss the case with them. There was no showing that the statement was read as directed. Counsel for defendant had registered a timely objection to the action of the Court permitting the jury to separate.

In *Panczko*, the case was submitted to the jury for deliberation at 4:30 P.M. They had not agreed by 10:30 P.M., at which time the Court permitted the jury to separate after first admonishing them not to discuss the case with anyone, and not to read about the case. Several jurors advised the judge that they were required to ride trains for many miles, including the necessity of travel in desolate areas. The Seventh Circuit, relying upon *D'Antonio,* reversed and said that it was an abuse of discretion to permit the jury to separate. Once again, the defendant had registered a timely objection to the Court's action in permitting the jury to disperse.

The decisions in *D'Antonio* and *Panczko* are unique in that they are cases arising in Illinois where the law requires that a jury be kept together.

More in point is Kleven v. United States, 8 Cir., 1957, 240 F.2d 270, an opinion written by Circuit Judge Whittaker (later an Associate Justice of the Supreme Court of the United States), although in petitioner's case Judge Bryan gave repeated admonitions to the jury, including specifically an admonition prior to dispersing for the luncheon recess. In *Kleven,* the trial judge permitted the jury to separate over a period of several days and, in each instance, gave the customary admonition, including a weekend recess. The case went

to the jury on a Monday and, after the jury had deliberated for a time, they were excused until Tuesday morning *without* any further admonition. Judge Whittaker said:

> "There was no request to readmonish, and no objection to the failure to readmonish, the jury when they were permitted to separate for the last overnight recess, nor was there any evidence, or claim of any actual misconduct of the jury during that overnight recess, or at any time."

In none of the cases thus far discussed, except *Near*, was a possible death sentence involved.

In Holt v. United States, 218 U.S. 245, 31 S.Ct. 2, 54 L.Ed. 1021 (1910), the Supreme Court of the United States had before it a capital offense involving jury separation. Justice Holmes, in commenting upon the trial court's discretion, said:

> "As to his exercise of discretion, it is to be remembered that the statutes or decisions of many states expressly allow the separation of the jury even in capital cases. Other states have provided the contrary. The practice has varied, with perhaps a slight present tendency in the more conservative direction. If the mere opportunity for prejudice or corruption is to raise a presumption that they exist, it will be hard to maintain jury trial under the conditions of the present day."

It is suggested in *D'Antonio* that *Holt* is not controlling for the reason that the separation was permitted *during the trial*—not after the jury had commenced their deliberations—and likewise, no objection was taken in *Holt*. It is not clear from a reading of *Holt* that the permitted separation was so confined but, assuming such to be the case, the petitioner in the present case took no exception to the court's action at any time during the three day trial.

■ While we believe that the end result would be the same if the law of Virginia is held to be applicable, we feel that a proper interpretation of *Holt* leads to the conclusion that federal law, as interpreted by the federal courts, is controlling. McHenry v. United States, 1921, 51 App.D.C. 119, 276 F. 761. In Brown v. United States, 1938, 69 App. D.C. 96, 99 F.2d 131, the jury was permitted to separate *after they had commenced their deliberations* in a rape case, and the court made this comment:

> "We adhere to our decision in the McHenry Case, but in saying this we deem it not improper to draw forcibly to the trial court's attention that the discretion which we hold exists should be exercised with the greatest circumspection, especially in prosecutions for capital offenses. And in all criminal cases whenever jurors are permitted to separate, the court should invariably admonish them not to communicate with any person or allow any person to communicate with them on any subject connected with the trial, and not to read published accounts of the course of the trial."

True, in *Brown*, the separation was pursuant to an agreement with counsel for the accused—a situation which tacitly existed in petitioner's case,—but the principles remain the same.

In another capital case, Wheeler v. United States, 1947, 82 U.S.App.D.C. 363, 165 F.2d 225, cert. den. 333 U.S. 829, 68 S.Ct. 448, 92 L.Ed. 1115, the discretionary rule as to permitting the jury to separate was again affirmed, with the court stating that such action will not be reviewed unless it appears affirmatively that prejudice resulted. In *Wheeler*, death sentences upon two defendants were actually imposed and the judgments were affirmed.

■ Under the most liberal interpretation accorded to petitioner we can only say that in capital cases where objection is interposed to the jury being permitted to separate after deliberations have been commenced, *D'Antonio* and *Panczko* may have some vitality, especially where no admonitions were given or where the inconvenience to the jurors is likely to

touch upon their ability to give proper consideration to the case when they resume their deliberations. Since petitioner's case does not begin to meet this test, we hold that, under the circumstances presented, there was no error or constitutional defect in permitting the jury to separate, either during the trial or after deliberations have commenced.

### THE QUESTIONS ON THE VOIR DIRE

■ The lengthy motion filed by petitioner alleges that Judge Bryan acted as "an arm of the prosecution and not as an arbiter" in revealing certain information as to petitioner's background in propounding certain voir dire questions. Under the assumption that the trial court, in a proceeding under 28 U.S.C. § 2255, must accept the allegations as true for the purpose of determining whether a plenary hearing should be conducted, the petitioner was granted an opportunity to prove this allegation. While neither the petitioner nor the respondent saw fit to take the testimony of Judge Bryan—although such action was not discouraged by the district judge who conducted the plenary hearing—it is apparent that the allegation is wholly without merit.

Admittedly the questions propounded on voir dire were unusual. Actually there was no way for Judge Bryan to have knowledge sufficient to propound such questions if the information had not emanated from defense counsel. The theory of the defense was that petitioner was a wealthy dealer in narcotics; that he had no reason to "rob a two-bit supermarket" on the Eastern Shore of Virginia; and that, by way of alibi, he had been with his Negro girl friend, Bonita Tatum, in Baltimore about one hour and a half before the robbery which was committed many miles away from Baltimore. All counsel agree that these voir dire questions were discussed with Judge Bryan before they were propounded. They may have been dangerous questions but counsel knew that Davis would make a positive identification, and presumably they knew what Botto and the young girl would say. Moreover, the accomplice, McNabola, was present at petitioner's insistence, although he was not used as a witness. Presumably defense counsel knew that the prosecution could prove that petitioner had cohabited with Bonita Tatum—evidence that would be admissible as to her credibility—and defense counsel quite properly wanted the jury interrogated as to possible prejudice along these lines.

In summary, we find that the questions on the voir dire were propounded at the request of the petitioner and his trial counsel, and said questions were consistent with the theory of defense sought to be advanced.

### OTHER ISSUES

■ (1) Acting *pro se*, following the plenary hearing attended by petitioner, an affidavit was filed to the effect that Judge Bryan proceeded to pronounce sentence immediately following the rendition of the jury verdict. Whether this affidavit is filed for the purpose of showing that Judge Bryan never examined the presentence report, or whether it suggests that Judge Bryan examined the report before receipt of the verdict, is uncertain. In any event, it is immaterial. The probation officer, Anderson, filed an affidavit stating that he is certain that Judge Bryan read the report as he made some comment as to the names of petitioner's associates, they being mostly of Italian origin. The presentence report is dated May 19, 1958. Anderson has no independent recollection as to when Judge Bryan examined the report. Obviously, however, petitioner's trial counsel were aware of the fact that Judge Bryan had familiarized himself with the report as Mr. Cocke stated: "The Court has all the facts at its disposal from the probation officer or otherwise". The Court finds that Judge Bryan knew of the contents of the presentence report, but is unable to make an affirmative finding as to the precise time this report was reviewed by the presiding judge. As-

suming, without deciding, that the report was seen by Judge Bryan prior to the receipt of the jury verdict, this would afford no relief for the petitioner even though it is a technical violation of Rule 32(c) (1), Federal Rules of Criminal Procedure. At best, it is harmless error in view of the guilty verdict. Smith v. United States, 5 Cir., 1965, 340 F.2d 953. However, we must assume that Judge Bryan—then a district court judge with eleven years experience—knew the requirements of Rule 32(c) (1). Certainly there is no affirmative showing that he examined the report prior to the receipt of the verdict. Cox v. United States, 8 Cir., 1962, 309 F.2d 614, 619. Of course, we are not here confronted with the situation where a district judge, in a nonjury trial, examines the presentence report prior to any finding of guilt. Even if Judge Bryan did not read the report, this was within his rights under Rule 32, although such a practice is not recommended in serious cases.

There is no merit to the post-plenary hearing contention advanced by petitioner.

(2) Petitioner's counsel raise the issue that petitioner was not present during all stages of the trial. Comment has already been made as to his absence during the argument on change of venue. The Court has heretofore referred to the discussion of questions on the voir dire. Petitioner was present when Judge Bryan announced, at the first declared recess, that the jury would be permitted to separate. He was, of course, present during all stages of the voir dire examination, the selection of jurors, the charge, argument of counsel, receipt of verdict, sentence, arraignment, and at all material times. In fact, other than on the argument with respect to change of venue, there is no affirmative proof that counsel ever went in chambers to meet with Judge Bryan.

(3) There were many other issues raised by petitioner in his 94 page motion filed. They were considered in this Court's memorandum consisting of 11 pages, filed March 17, 1964, to which reference is hereby made. Many of these same points were the subject of an opinion by the Circuit Court of Appeals on the direct appeal.

The petitioner's motion will be denied. In taking this action the Court expresses it appreciation to Arthur Lambiotte and Philip L. Avis, counsel for petitioner, who have diligently represented the petitioner in this proceeding under rather trying circumstances. The Court regrets that the Criminal Justice Act of 1964 does not permit the allowance of compensation in post-conviction proceedings.