UNITED STATES of America,
Appellee,

v.

Shirley BRELAND, Mahlon Steward and Edward Zigler, Appellants.

No. 379, Docket 30949.

United States Court of Appeals
Second Circuit.

Argued March 23, 1967.

Decided April 20, 1967.

---

Marvin B. Segal, New York City, for appellants.

John H. Doyle, III, (Robert M. Morgenthau, U. S. Atty., and Pierre N. Leval, Asst. U. S. Atty., of counsel), for appellee.

Before MOORE and HAYS, Circuit Judges, and DOOLING, District Judge.*

DOOLING, District Judge.*

The appellants Breland, Steward and Zigler were indicted with seven others for conspiring to violate 18 U.S.C. § 2314, which forbids the transporting of forged securities in interstate commerce "knowing the same to have been  *  *  * forged  *  *  *." Seven defendants went on trial together; a mistrial was declared as to one defendant, a verdict was directed as to a second defendant, and one defendant was acquitted. Four defendants were convicted, but only three have appealed. A different ground of reversal is urged on behalf of each appellant.

For Breland it is argued that the Court should not, after taking the jury's verdict as to four defendants and hearing that they were unable to reach a verdict as to Breland, have permitted the jury to separate overnight and then resume deliberations on the next day, when a verdict of guilty was rendered against Breland.

For Zigler it is argued that the evidence was legally insufficient to establish his participation in the conspiracy by any words or acts that formed or advanced it.

For Steward it is argued that the Court should have granted a supplemental charge drawing the jury's attention to Steward's defense that he "could not have known that there was interstate commerce because he never saw a check."

1. The jury received the case a little after noon, but went at once to lunch. During the afternoon the jury asked to have the Breland testimony read and to examine an exhibit that related to her;

* Eastern District of New York, sitting by designation.

they asked also for a reading of certain other testimony. The jury went to dinner, and, about an hour and a half after returning from dinner, announced that they had reached a partial verdict. Their verdict acquitted one defendant and found Zigler, Steward and a third defendant guilty, and they reported, at first, "We have reached a point where it is not possible to reach an agreement on the fifth defendant," and, later, "In the case of the defendant Breland we are unable to reach a verdict."

Judge Tyler then asked counsel whether there were any other applications before he discharged the jury. Defense counsel made no application, but the Government emphatically asked that the Court direct further deliberation under an appropriate instruction. In view of the selectiveness of the verdict, Judge Tyler was at first disinclined to have the jury resume its deliberations; Breland's counsel opposed any "Allen charge," objected to resumption of deliberations so late, and favored discharge of the jury. Judge Tyler then suggested permitting the jury to separate for the night and to resume deliberation in the morning. Breland's counsel mildly indicated that "there might be some impropriety" in that course, but did not put forward any specific ground of objection.

The jurors then separated, under an instruction not to talk about the case to anyone and to resume their deliberations in the morning "for a little while," "a little longer in the morning." The jury re-assembled at 10:00 o'clock the next morning, and it returned a verdict of guilty against Breland at 10:30 in the morning. The Court was not asked to and did not ask the jurors whether they had obeyed his admonition before taking the verdict.

It is not contended that there was in fact any improper approach to any juror, or any impropriety of any sort. The argument is, in effect, that the risk of impairing the integrity of the jury's deliberation through the manifold exposures implicit in any unsupervised overnight separation so far outweighs the modest inconvenience of overnight sequestration that no verdict taken after such a separation may stand.

The facts in this case are indeed such that Breland's conviction may be reversed only if the Court was wholly without power to send the jurors home overnight with directions to return and resume deliberations the following morning. Two cases in the Seventh Circuit may very closely approach that view of the matter (United States v. D'Antonio, 1965, 342 F.2d 667; United States v. Panczko, 1965, 353 F.2d 676), but in each case the circumstances and manner of the overnight separation contributed to the reversal, and it was not clearly based on the fact of separation taken in isolation. No federal case appears unmistakably to forbid separation after the submission of the case to the jury, and Lucas v. United States, 8th Cir. 1921, 275 F. 405, necessarily assumed the propriety of permitting a separation when there was no place to lodge the jurors overnight. Consent to the separation has been thought enough to validate a verdict rendered after the jury re-assembles. See, e. g., United States v. Di Fronzo, 7th Cir. 1965, 345 F.2d 383, 385; Kleven v. United States, 8th Cir. 1957, 240 F.2d 270. And the Court of Appeals of the Tenth Curcuit has recently affirmed a verdict reached after the jury had separated and re-assembled, holding that "the trial court has full discretion in determining whether the jury shall be allowed to separate * * * during the course of the trial or thereafter * *." Hines v. United States, 1966, 365 F.2d 649, 651.

█ Breland emphasizes that the marshal's oath, when he takes the jury in charge, requires him, in age sanctioned language, "to keep the jurors * * * in some private and convenient place * * * suffer no person to speak to them, nor * * * speak to them yourself * * * unless it be to ask them if they have agreed upon a verdict." Cf. Rex v. Neal, [1949] 2 K.B. 590, 596. But that oath is administered in every case, civil no less than criminal, and it

is generally acknowledged that separation is permissible in civil cases (see e. g., Liverpool & L. & G. Ins. Co. v. N. & M. Friedman Co., 6th Cir. 1904, 133 F. 713), and in misdemeanor cases. See 5 Wharton, Criminal Law and Procedure, 1957, 284–285; Annotation, 1952, 21 A.L.R.2d 1088, 1139–1140. The justification for any rule against separation, and the older sequestration rule applied throughout the trial, as Wharton shows (id. 277–286; cf. Holt v. United States, 1910, 218 U.S. 245, 250–251, 31 S.Ct. 2, 54 L.Ed. 1021), is the fear of interference. But the ancient extremes of jury sequestration that Blackstone elaborates (3 Blackstone, Commentaries *375–*376) have disappeared, sequestration during criminal trials has become the exception, and there appears no present reason for making sequestration mandatory after the case has been submitted to the jury for determination. It must be concluded that the trial court had the power to permit the jury to disperse overnight and resume its deliberation on the next day and that the occasion was a proper one for the exercise of that power.

2. Zigler argues that he was not shown to have been a participant in the conspiracy to transport forged securities in interstate commerce knowing that they were forged. The evidence, however, was more than sufficient to require submission of the case against Zigler to the jury.

Dillard, who pleaded guilty before the trial here involved, testified that Steward had asked him to dispose of "some money orders," and that Steward then took Dillard and another man to Brooklyn, picked up Breland at her apartment and drove to another apartment where Zigler was. Zigler and Breland went upstairs and soon returned with Zigler carrying a brown bag which he handed to Breland. The bag contained money orders of Travelers Express Co. drawn on a New Jersey bank. Breland gave twenty of the money orders to Dillard in a car outside Zigler's apartment building. Dillard was uncertain whether Zigler was in the car or standing alongside it during this transaction.

Dillard testified to having trouble passing the money orders, but that he went back to Breland and got 60 or 65 more of the money orders from her. Then they drove again to Zigler's place and Zigler got into the car with Breland, Dillard and Steward, and Dillard's problems in passing the money orders were discussed. Breland stated, in Zigler's presence, that she and Zigler and another person had passed some of the money orders that morning. Breland exhibited some of the kind that she had passed— they bore a rubber-stamp signature— and, as before, terms of payment by Dillard to Breland were agreed upon.

In addition Special Agent McDonald of the Federal Bureau of Investigation testified that he showed Zigler a picture of Breland, that Zigler identified her as someone he knew who lived at some place in Brooklyn that he did not exactly know, and that Zigler said that he had never known her to possess any money orders, and had never received any from her.

In aggregate the evidence warranted the jury in concluding that Zigler was a party to the conspiracy and had borne a part in carrying it out. It is true that Dillard's testimony does not assign a very active role to Zigler, but it shows his privity to Breland's possession of the money orders, his participation in passing some of them, and his presence at a planning session. Cf. United States v. Wilson, 2d Cir. 1965, 342 F.2d 43, 45; United States v. Garguilo, 2d Cir. 1962, 310 F.2d 249, 253–254. If the jury accepted Dillard's testimony, then it could find further support for its verdict in Agent McDonald's testimony that Zigler admitted knowing Breland, but denied knowing exactly where she lived, and denied that he had ever known her to possess money orders. The denials the jury could regard as false exculpations indicating consciousness of guilt. United States v. DeAlesandro, 2d Cir. 1960, 361 F.2d 694, 697–698; Unit-

ed States v. Wilson, supra, 342 F.2d at 45.

3. Steward contends that it was error to decline to give a supplemental charge that he requested which would have reminded the jury to acquit Steward unless they found that he knew the money orders would move in interstate commerce. The Court below explicitly charged that the jury "must find that each defendant knew that one activity of the unlawful enterprise in which he is said to have participated was the illegal transportation across state lines or the causing of such transportation of * * * forged * * * securities * * * knowing that they were forged * * *." The Court, further, stated what evidence would suffice to warrant a finding that a defendant knew the money orders would have to pass in commerce. Steward's counsel argued in his summation that proof of such knowledge was an essential element of the charge and that the evidence did not establish that Steward had observed that the money orders were drawn on a New Jersey bank; there was no objection to that summation. Steward's belated request did not ask the Court to charge on a theory of defense but, rather, specially to dignify a debatable argument on the facts. The Court was, therefore, right in declining to distort the emphasis of his general charge by repeating the point as to Steward in a supplemental charge that could only seem to give a special status to the inferences that Steward had urged from the evidence. Cf. United States v. Kahaner, 2d Cir. 1963, 317 F.2d 459, 477.

Judgments of conviction affirmed.

HAYS, Circuit Judge (concurring in the result):

I concur in the result but I differ from the majority in respect to the significance to be attached to Zigler's denials and to the fact that no objection was taken to Steward's counsel's summation on the issue of Steward's knowledge of the interstate character of the money orders.