UNITED STATES of America,
Plaintiff-Appellee,

v.

John E. ACUFF, Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Charles Edward PRUETT, Defendant-Appellant.

Nos. 18619, 18620.

United States Court of Appeals
Sixth Circuit.

April 21, 1969.

Tom A. Greer, Jr., Dunlap, Tenn., for appellant Acuff, Howard G. Swafford, Jasper, Tenn., on brief.

Paul W. Sorrick, Jr., Chattanooga, Tenn., for appellant Pruett.

W. Thomas Dillard, Knoxville, Tenn., for appellee, J. H. Reddy, U. S. Atty., Robert A. Scott, Asst. U. S. Atty., Chattanooga, Tenn., on brief.

Before WEICK, Chief Judge, and O'SULLIVAN and COMBS, Circuit Judges.

COMBS, Circuit Judge.

These appeals are by co-defendants, John E. Acuff and Charles Edward Pruett, who were found guilty by a jury of conspiring to sell, transfer, or deliver counterfeit money in violation of 18 U. S.C. §§ 371 and 473. Acuff was sentenced to thirty months and Pruett to five years imprisonment.

The Government's proof consisted primarily of the testimony of C. V. Lyda, a special agent of the United States Secret Service, who had worked on the case. Lyda testified that he, accompanied by one William Turner, first met defendant Acuff on July 28, 1967, at Acuff's garage in Jasper, Tennessee. Lyda was introduced to Acuff as Jim Wood, owner of a North Carolina truckstop. At first, the discussion centered around setting up an illicit distillery, and then about the subject of counterfeiting. When Lyda expressed an interest in purchasing counterfeit notes, Acuff promised to procure some samples for his inspection. According to Lyda, Acuff told him that he obtained his notes cheaper by procuring buyers for his supplier. Lyda was again in touch with Acuff on July 30th and on August 1st and 2nd, but no samples were furnished.

On August 7th, Acuff assured Lyda that his source would contact him to set up a sale. When these assurances failed to materialize, Lyda again contacted Acuff on August 9th and Acuff produced a small piece of paper on which some numbers and the name "Eddie" appeared. Acuff told Lyda that Eddie was the

person who would contact him. Acuff then quoted him a price of twenty-five cents on the dollar or twenty cents on the dollar if notes in excess of $20,000 were purchased.

On August 12th following meetings with Acuff on August 10th and 11th, Lyda was given the piece of paper he had seen on August 9th. He was told to call Eddie at the number listed on the note and to leave a message for Eddie to call John Acuff at a room occupied by Lyda in a Chattanooga motel. As a result of the telephone calls, a meeting was arranged between Lyda and defendant Pruett for August 13th. On that date Lyda first came in contact with Pruett at the Chattanooga motel. After some preliminary discussion and a call to Acuff to double check Lyda's trustworthiness, Pruett offered to sell the notes to Lyda at the same price previously quoted by Acuff. By August 14th, definite arrangements had been made for Lyda to go to the North Carolina truckstop where the transfer would take place. However, when Pruett made no delivery by August 16th, Lyda phoned Acuff who assured him that the deal was still on. Lyda gave Acuff his telephone number at the motel where he was staying in North Carolina, and Pruett later called to confirm the sale. On August 17th, Pruett and an associate arrived at the appointed place in North Carolina. The counterfeit notes were produced, and Pruett and the accomplice were arrested. Acuff was arrested on September 1st. At that time he had in his possession counterfeit notes, as well as a notation of Pruett's name, address, and telephone number.

To controvert Agent Lyda's testimony, the defense produced only one witness— Acuff. Acuff admitted a series of meetings with Lyda, but maintained that their discussions were directed only to manufacturing whiskey and not to the sale of counterfeit money. He testified that, after repeated inquiries, he told Lyda that he did "know of a fellow" who manufactured whiskey and that, if he saw the man, he would get his name and telephone number and relay it to Lyda; that, coincidentally, he did see Pruett and obtained the information which he supplied to Lyda.

Appellants first assert that their request for a continuance due to alleged prejudicial pre-trial publicity was erroneously denied. Specific reference is made to statements of an "Assistant Attorney General," relating to charges' pending against Acuff, which were carried in a newspaper article circulated on the evening before and the morning of the first day of the trial.

The trial judge conducted a careful and exhaustive voir dire of prospective jurors. Those who gave any indication that they had knowledge of the case were excused. Moreover, at the conclusion of the judge's examination, each side conducted its own voir dire, directed in part to the question of pre-trial publicity.

▇ Nothing was developed on the voir dire which would have justified postponement of the trial. Appellants have neither demonstrated nor suggested that any member of the jury as finally constituted had gathered any knowledge of the case from news articles or otherwise. The district court properly denied the motion for continuance.

Appellants next complain that the trial court erred in admitting into evidence statements allegedly made by one defendant out of the presence of his co-defendant before the prosecution made a prima facie showing of conspiracy. Agent Lyda testified, over timely objections, to various out-of-court statements made to him by one of the defendants out of the other's presence. In each instance, the jury was instructed that the statements of one of the defendants could be considered against his co-defendant only if the jury found from other proof that a conspiracy existed. The proper admonition was also included in the court's final instructions.

▇ It is a well-settled exception to the hearsay rule that declarations of a conspirator made in furtherance of the

conspiracy are admissible against co-conspirators not present when the statements were made. However, since these declarations are admissible only on the assumption that a conspiracy exists, it naturally follows that there must be proof aliunde to connect an alleged conspirator to the conspiracy. Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); Continental Baking Co. v. United States, 281 F.2d 137 (6th Cir.1960). It is within the trial judge's discretion to admit declarations and acts of an alleged co-conspirator subject to later proof of the existence of the conspiracy. Enriquez v. United States, 314 F.2d 703 (9th Cir.1963); Rizzo v. United States, 304 F.2d 810 (8th Cir.1962); United States v. Dennis, 183 F.2d 201 (2nd Cir.1950). See United States v. Harris, 391 F.2d 348 (6th Cir.1968). See generally IV Wigmore on Evidence § 1079. In following this well-established procedure, the trial judge did not abuse his discretion under the circumstances present here.

In denying defendants' motions for a judgment of acquittal, the trial judge held, in effect, that a prima facie showing of conspiracy had been made as to each defendant, independently of the questioned declarations of the alleged co-conspirators. Our review of the record convinces us that this conclusion was correct. See United States v. Hoffa, 349 F.2d 20, 41 (6th Cir.1965), aff'd, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966).

Appellants also assert as an evidentiary error the admission of certain rebuttal evidence, relying on the exclusionary rule prohibiting impeachment on collateral issues. On direct examination, Acuff expressly denied that he had "ever been in the counterfeiting business or connected with it." Then, on cross-examination in answer to specific questioning, Acuff denied that during June, 1967 he had shown Herman Newman counterfeit obligations or that he had permitted Donald Harris to help him count counterfeit notes. Newman and Harris were produced to rebut Acuff's denials. They testified that they had seen Acuff in possession of counterfeit notes. Appellants contend that possession of counterfeit notes prior to the time charged in the indictment was a collateral matter, and that admission of extrinsic evidence to impeach Acuff's denial of such possession was prejudicial error. We disagree.

When Acuff made the sweeping denial on direct examination that he had ever been connected with the counterfeiting business, he opened the door for examination on this subject. Walder v. United States, 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954); Michelson v. United States, 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168 (1948); Ferrari v. United States, 244 F.2d 132 (9th Cir.1957), cert. denied, 355 U.S. 873, 78 S.Ct. 125, 2 L.Ed.2d 78 (1957). The jury was instructed that the rebuttal testimony was introduced solely for the purpose of attacking Acuff's credibility, and was not to be considered for any purpose against Pruett. We find no error here.

Appellants next complain that they were prejudiced by the separation of the jurors over the weekend after the case had been submitted to the jury. Deliberations began around 7:30 P.M. on Friday. Defendants' counsel stated that they would oppose separation of the jurors should that question arise due to the widespread publicity which they alleged had already been given to the case. Around 11:00 P.M., at the jury's request, the judge dismissed them until Monday morning after giving the usual cautionary instructions.

The majority view in federal courts seems to be that the trial court has discretion in a non-capital case to decide whether the jury should be allowed to separate during the course of its deliberations. Tyler v. United States, 397 F.2d 565 (5th Cir.1968); United States v. Breland, 376 F.2d 721 (2nd Cir.1967); Hines v. United States, 365 F.2d 649 (10th Cir.1966). See Cardarella v. United States, 375 F.2d 222 (8th Cir. 1967); Lucas v. United States, 275 F.

405 (8th Cir.1921).[1] We note, however, that in United States v. Panczko, 353 F.2d 676 (7th Cir.1965), and in United States v. D'Antonio, 342 F.2d 667 (7th Cir.1965), it was held that permitting the jury to separate after final submission of the case was error under the circumstances there existing.

■ We are of the opinion that a rule making sequestration mandatory during deliberations but discretionary during the course of the trial draws an unsound distinction. Those jurors who are susceptible are just as likely to be influenced when separated during the course of the trial as when separated while deliberating. Tyler v. United States, *supra*; United States v. D'Antonio, *supra*, (dissenting opinion). Whether sequestration is necessary should turn on the special facts of each case rather than on the stage of the trial process. Circumstances surrounding some criminal trials even in non-capital cases clearly demand sequestration. Certain cases by their nature create wide public interest and invite discussion. In such cases the likelihood that jurors might be subjected to outside influences is increased. Prejudicial publicity could be the decisive factor in ordering sequestration in other cases. See Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). Another example is furnished by United States v. Hoffa, *supra*.

■ However, where there is no valid reason to believe that separation will deprive an accused of a fair trial, the totality of circumstances, including such factors as inconvenience to jurors, the possibility of hastened verdicts to avoid prolonged sequestration, lack of adequate lodging, and the extent of the publicity given to the case, may indicate that separation will not prejudice the defendant and will serve the best interests of all concerned. The trial judge is in the best position to weigh these various factors and we are of the opinion that he should be given the discretion to make the determination. This discretion should be exercised with caution, of course, and any charge of outside influence should be given careful consideration.

■ The appellants here have failed to demonstrate the presence of an atmosphere so fraught with prejudicial publicity as to justify an inference that prejudice was probable without sequestration. There is no showing of widespread interest in the case and no attempt was made to show that any juror was subjected to outside influence. Prejudice should not be presumed where there is absolutely nothing in the record to justify such an inference. Aiuppa v. United States, 393 F.2d 597 (10th Cir. 1968). We find that the trial court properly exercised its discretion and we find no error in permitting the jury to separate under proper admonition.

■ Lastly, appellants contend there was not sufficient competent evidence to support the verdict. We cannot agree. The evidence is clearly sufficient to support the verdict.

Judgment affirmed.

---

1. Many of the states have dealt with this problem by statute. Although the rules prevailing in those states are many and varied, the general rule seems to be that the trial court has discretion to permit the jury to separate during the trial of a non-capital case prior to final deliberations. However, in most states jurors may not separate in felony cases after a case has been finally submitted to them. In some jurisdictions where separation is allowed after submission, it may be permitted in both capital and non-capital cases. 53 Am.Jur. Trial §§ 866–75; Annot., 21 A.L.R.2d 1082 (1952).