**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Clyde Lee JOHNSON, Jr., Defendant-Appellant.**

**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Gary NOEL, Defendant-Appellant.**

**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Jeff Davis NOEL, Defendant-Appellant.**

**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Edward Joe STEWART, Defendant-Appellant.**

**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Robert Earl STEWART, Defendant-Appellant.**

**UNITED STATES of America, Plaintiff-Appellee,**

v.

**William R. MORROW, Defendant-Appellant.**

**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Margaret NOEL, Defendant-Appellant.**

**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Freeman Turner MONGER, Defendant-Appellant.**

---

**2.** See also *United States v. Frederick,* 583 F.2d 273 (6th Cir. 1978).

UNITED STATES of America,
Plaintiff-Appellee,

v.

Jimmy D. JACKSON,
Defendant-Appellant.

Nos. 77–5315 to 77–5320 and 78–5009
to 78–5011.

United States Court of Appeals,
Sixth Circuit.

Argued June 15, 1978.

Decided Sept. 28, 1978.

Rehearing Denied Nov. 13, 1978.

Rehearings Denied Dec. 22, 1978.

150

Richard W. Foster, Memphis, Tenn. (Court-appointed), for defendant-appellant in No. 77–5315.

W. J. Michael Cody, U. S. Atty., Glen Reid, Jr., Sp. Asst. U. S. Atty., Memphis, Tenn., for United States.

John Allen Fox, Richmond, Va., for defendants-appellants in Nos. 77–5316, 77–5317 and 78–5009.

Arch B. Boyd, III, Memphis, Tenn. (Court-appointed), for defendant-appellant in No. 77–5318.

Kemper B. Durand, Memphis, Tenn. (Court-appointed), for defendant-appellant in No. 77–5319.

William Stephen Crain, Mountain Home, Ark. (Court-appointed), for defendant-appellant in No. 77–5320.

Stanley Fink, Memphis, Tenn. (Court-appointed), for defendant-appellant in No. 78–5010.

James F. Russell, Memphis, Tenn. (Court-appointed), for defendant-appellant in No. 78–5011.

Before CELEBREZZE and MERRITT, Circuit Judges, and PECK, Senior Circuit Judge.

CELEBREZZE, Circuit Judge.

Six defendants were convicted in a jury trial and three more defendants were convicted in a separate jury trial on several counts of distribution of heroin and conspiracy under 21 U.S.C. §§ 841(a)(1) and 846. Inasmuch as all charges arose from the same indictment and each appeal raises numerous and often overlapping issues, we have consolidated the appeals for purposes of review. For the reasons stated below, we find no merit in any of appellants' contentions and affirm in full the judgments of the district court.

## PROCEDURAL HISTORY

On November 10, 1976, the grand jury returned an eighteen count indictment charging fourteen defendants with conspiring to possess and distribute heroin (Count I; 21 U.S.C. § 846) and charging each of them, in different combinations or individually, with various substantive counts of distribution of heroin (Counts II–XVIII; 21 U.S.C. § 841(a)(1)). A jury trial was scheduled for ten of the fourteen defendants. The other four were unable to appear:

Cicero Johnson had been murdered; Ann Cox had been shot and hospitalized; Clifton Garner had eluded apprehension; and Freeman Monger's attorney was hospitalized. The trial started in early February 1977. A jury was sworn and testimony had just begun when, during an overnight recess, firebombs were thrown into the homes of close relatives of two government witnesses. Advised of the firebombings the next morning, the district court held a hearing on the matter and declared a mistrial.

In the second trial, commenced in mid-February 1977, the jury was sequestered. In due course, the jury returned its verdicts and acquitted Denise Stewart and Willie Payne on all charges and Gary Noel on one substantive count. It returned guilty verdicts against Jeff Noel (conspiracy; four substantive counts), Gary Noel (conspiracy; one substantive count), Robert Stewart (conspiracy; three substantive counts), Edward Stewart (conspiracy; one substantive count), William Morrow (conspiracy; two substantive counts), and Clyde Johnson (conspiracy; three substantive counts). The jury was deadlocked, and a mistrial was declared, on all counts as to Margaret Noel and Jimmy Jackson and on one substantive count (later dismissed) as to Jeff Noel.

A third trial began in mid-April 1977. The jury returned a not guilty verdict as to one substantive count against Margaret Noel. It also returned guilty verdicts against Margaret Noel (conspiracy), Jimmy Jackson (conspiracy; one substantive count), and Freeman Monger (conspiracy; four substantive counts), whose attorney had by this time recovered.

The district court sentenced the defendants to prison terms ranging from four to forty years and to fines of up to $20,000, plus varying special parole terms.

## FACTS

All appellants were acquainted with one another and several were related. Jeff Noel and Margaret Noel were husband and wife and Gary Noel was their teenage son. Two other younger teenage Noel children

were apparently involved in heroin sales but not charged. Robert Stewart and Edward Stewart were brothers.

The government demonstrated at the trials that Jeff Noel and his family were running a large scale heroin distribution center from the Noel residence in Memphis. The Noels supplied at least three subsidiary distribution centers—one operated by William Morrow at Morrow's apartment, a second one operated by Robert Stewart at a Bullington Avenue apartment complex, and a third operated by Freeman Monger and Clyde Johnson at a Ford Road room. The government's case was built primarily on a number of "controlled buys" of heroin at these four locations. The buys were made by former heroin users or addicts working as informants for state and federal drug agencies. Most buys were recorded on tape by concealed transmitters on the informants.[1]

Several witnesses testified that they had obtained heroin at the Noel residence from, inter alia, Jeff Noel, Margaret Noel and Gary Noel. One witness testified that she had seen Robert Stewart buy heroin at the Noel residence. Robert Stewart and William Morrow were seen there on another occasion. There was testimony about large quantities of heroin and currency often seen lying around the Noel residence. Other testimony related the dilution of pure heroin into marketable portions there. Pursuant to warrants, two searches of the Noel residence occurred.[2] Items seized and introduced at trial included: lactose (often used to dilute pure heroin), disposable syringes, a heroin test kit, several thousand dollars in currency, a plastic bag sealing machine, a burned metal measuring spoon, a box containing measuring spoons, plastic bags and small tin foil squares, metal sifters, a plexiglas board with traces of heroin on it, and photographs.[3]

Witnesses testified about several controlled buys at William Morrow's apartment from Morrow. It appeared that Morrow once called either Jeff Noel or Robert Stewart to "check out" one heroin purchaser before making the sale.

Testimony described numerous buys, controlled and otherwise, at the Bullington Avenue apartments. Robert Stewart supervised the sales of heroin there, which was delivered there by Robert Stewart or Freeman Monger. Jimmy Jackson and Edward Stewart were identified as salesmen there. It was shown that Freeman Monger had referred sales from his apartment to this location—since the "heat was on" and Monger was turning his "business" over to Robert Stewart. After a fruitless search by the authorities had occurred at the Bullington apartments, Jeff Noel came by and inquired of Robert Stewart, Edward Stewart and Jimmy Jackson if anything had been found by the officers. They responded negatively. One witness testified that Robert Stewart said Jeff Noel was the supplier of heroin there.

Witnesses testified about several controlled buys of heroin from Clyde Johnson and Freeman Monger at their Ford Road room. One buy was preceded by an inquiry at the Noel residence with Monger and Jeff Noel present which resulted in Monger leading the buyers to his Ford Road room. Witnesses said that Clyde Johnson told them he was selling for Freeman Monger.

## LEGAL ISSUES

Each appellant has raised a number of issues on appeal. Since the issues often overlap, we will examine each colorable is-

---

1. In some instances the buy itself was not recorded but a subsequent followup telephone conversation between buyer and seller was recorded. Both types of tapes were played for the jury.

2. Several appellants have argued that the district court erred in admitting the fruits of these searches but their objections were not the subject of a pre-trial motion to suppress and were thus waived. Federal Rule of Criminal Procedure 12(b)(3) & (f).

3. Apparently someone had a proclivity to take incriminating photographs. The photographs depicted several scenes inside the Noel residence and included several defendants, quantities of powder resembling heroin and various amounts of currency.

sue as it relates to each defendant raising it.[4]

### 1. Double Jeopardy

Two double jeopardy arguments have been raised. First, it is claimed that since jeopardy had attached at the first trial before a mistrial was declared the second trial was prohibited by the fifth amendment proscription against being placed twice in jeopardy for the same offense.[5] The mistrial was declared because of the firebombings of the homes of close relatives of two government witnesses. At the hearing held by the district court on the morning after the bombings, the government attorney disclosed that his intelligence information led him to be concerned about the safety of not only the witnesses but also the jurors. The district court made a "finding that there has been sufficient problem of intimidation of witnesses' families to make this a dangerous situation" and "that there is enough danger [to] declare a mistrial."

 The question whether a mistrial granted other than at the defendant's motion[6] bars a subsequent trial turns on whether the government can demonstrate "manifest necessity" for it. *Arizona v. Washington*, 434 U.S. 497, 505–06, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978), and cases cited therein. In a close case, the trial judge's ruling on the need for a mistrial "is entitled to special respect." *Id.* at 510, 98 S.Ct. 824. But this is not a close case. A reasonable fear for the safety of witnesses or jurors clearly suffices as "manifest necessity."[7] The district court did not abuse its discretion in dismissing the jury which was potentially endangered, and empaneling a new, sequestered jury.

 The second double jeopardy issue is raised by Margaret Noel, who argues that the third trial, in which she was convicted, was barred by the second mistrial caused by the deadlocked jury.[8] Suffice it to say that a genuinely deadlocked jury is the "classic basis for a proper mistrial." *Id.* at 509, 98 S.Ct. at 832 (footnote omitted). "The trial judge's decision to declare a mistrial when he considers the jury deadlocked is . . . accorded great deference by a reviewing court," *id.* at 510, 98 S.Ct. at 832, and we see no reason to disturb that decision here.

### 2. Venue Change/Sequestration

Freeman Monger and Jimmy Jackson have argued the district court erred in not granting their motions for a change of venue due to pretrial publicity surrounding their case in the Memphis media.[9] They note that their convictions stemmed from the third trial in this case, with each trial receiving considerable press attention. Indeed, it would have been surprising for this case, involving a large heroin distribution ring, one defendant being murdered and another shot, and firebombings, not to have received intense local media attention.

"The Supreme Court has reversed a conviction because it presumed that pretrial publicity had made a fair trial impossible only in the case of *Rideau v. Louisiana*, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963).[32]" *United States v. Haldeman*, 181

---

**4.** All appellants but one have challenged the sufficiency of the evidence either as it related to the conspiracy count or the respective substantive counts. In light of the overwhelming evidence related above, most of these claims are patently frivolous and the others are meritless.

**5.** This issue is applicable to all but Freeman Monger, who was not involved in the first trial, but is raised only by Margaret Noel, Jeff Noel, Gary Noel and Edward Stewart.

**6.** Not all defendants objected to the mistrial but we will assume for purposes of analysis that all did object.

**7.** We do not address whether a mistrial was *required* under these circumstances.

**8.** This claim is also applicable to Jimmy Jackson but was not raised by him.

**9.** This claim is also applicable to Margaret Noel but was not raised by her.

The general issue of venue change is also applicable to the six defendants convicted in the second trial but is raised by none of them on appeal.

U.S.App.D.C. 254, 283–284, 559 F.2d 31, 60–61 (1976), *cert. den.* 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977).[10] In *Rideau*, a film of the defendant confessing to bank robbery, kidnapping and murder was broadcast three times to large audiences in a relatively small Louisiana parish. Two factors were critical in *Rideau*—first, the pervasive quantity of publicity and, second, the inherent prejudice in a confession. Here, the quantity of the publicity fell far short of that in *Rideau*.[11] And the nature of the publicity was not nearly as prejudicial as that in *Rideau*. The publicity cited by appellants here was primarily descriptive of the indictment, trials and related proceedings.[12] It does not cause us to conclude "that the population of [Memphis] was so aroused against appellants and so unlikely to be able objectively to judge their guilt or innocence on the basis of evidence presented at trial that their due process rights were violated by the District Court's refusal to grant . . . a change of venue prior to attempting selection of a jury." *Haldeman, supra,* 181 U.S.App.D.C. at 286, 559 F.2d at 62 (footnote omitted).

■■ The merit of a change of venue motion is most likely to be revealed at voir dire of the potential jurors. Through proper questioning the court can determine the extent of the veniremen's exposure to the publicity and the effect it has had upon them. Exposure to publicity alone does not presumptively deprive the defendant of his right to fair and impartial jurors. *Murphy v. Florida,* 421 U.S. 794, 799, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975). *See also Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 551–56, 565, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976). Rather, the test is whether any potential juror who has been exposed to publicity "can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Irvin v. Dowd,* 366 U.S. 717, 723, 81 S.Ct. 1639, 1643, 6 L.Ed.2d 751 (1961). *See also Murphy, supra,* 421 U.S. at 800, 95 S.Ct. 2031; *United States v. Gay,* 522 F.2d 429, 432 (6th Cir. 1975). Here, all of the veniremen who had read, heard or seen anything about the case said this exposure would not affect their decision and that they had not formed any opinion on the matter. Based upon this development, the district court properly denied the change of venue motion.

■ Freeman Monger has also argued that the publicity during the third trial was sufficient to justify sequestering the jury, and that it was error not to do so.[13] The decision on sequestering a jury is entrusted to the sound discretion of the trial judge. *United States v. Swainson,* 548 F.2d 657, 664 (6th Cir.), *cert. den.* 431 U.S. 937, 97 S.Ct. 2649, 53 L.Ed.2d 255 (1977); *Blackmon v. United States,* 474 F.2d 1125, 1126 (6th Cir.), *cert. den.* 414 U.S. 912, 94 S.Ct. 252, 38 L.Ed.2d 150 (1973); *United States v. Acuff,* 410 F.2d 463, 466–67 (6th Cir.), *cert. den.* 396 U.S. 830, 90 S.Ct. 82, 24 L.Ed.2d 81

**10.** Footnote 32 in the quoted language notes that other Supreme Court cases relied upon by the appellants there "either turned on factors other than pretrial publicity or involved the Court in an examination to determine whether the trial was in fact unfair." *See Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966) (massive publicity during trial); *Estes v. Texas,* 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965) (televising and broadcasting of trial); *Turner v. Louisiana,* 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965) and *Marshall v. United States,* 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959) (both involving events during trial); and *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961) (independent evaluation of voir dire).

**11.** The voir dire at the third trial revealed that only six of thirty veniremen had read, heard or seen anything about the case.

We also note the difference between the large Memphis metropolitan area (or, indeed, the entire Western District of Tennessee, whence the veniremen were drawn) and the small parish in *Rideau*.

**12.** Before this Court, appellants rely only upon a number of newspaper articles from the Memphis papers. Those articles which are most prejudicial are discussed in Part 3, *infra*.

**13.** This claim is also applicable to Margaret Noel and Jimmy Jackson but was not raised by them.

The jury in the second trial was sequestered, so the claim is inapposite to the other appellants.

(1969). We see no abuse of that discretion here. Moreover, we believe that the failure to sequester a jury standing alone could rarely, if ever, constitute reversible error. A defendant would have to demonstrate actual prejudice or at least substantial likelihood thereof flowing from the failure to sequester in order to warrant a new trial. No specific prejudice has even been alleged here, much less demonstrated. The district court did not err in refusing to sequester the jury in the third trial.

## 3. Voir Dire

■ All of the appellants from the second trial challenge the adequacy of the trial judge's voir dire of prospective jurors.[14] The most serious claim is that the judge did not inquire sufficiently into the exposure of veniremen to prejudicial pretrial publicity. All prospective jurors were asked as a panel whether they had read or heard anything about the case. Most were also questioned individually on this matter. Those who indicated prior knowledge were generally asked where and when they had heard about the case, but they were not questioned (and were not allowed to comment) about the content of what they had read or heard. All veniremen not otherwise dismissed for cause assured the court that their prior knowledge would in no way affect their ability to render a fair and impartial verdict.[15]

■ Appellants argue that their rights to intelligently exercise peremptory challenges were impaired by the trial judge's refusal to question prospective jurors more intensely on their recollection of the content of pretrial publicity.[16] They assert that the case received considerable media attention in the weeks preceding trial, and that the firebombings and mistrial created a great potential for juror bias. Under the circumstances, it was arguably important for appellants to know whether prospective jurors remembered anything of significance from publicity to which they had been exposed.

■ We have previously noted that the "essential function of voir dire is to allow for the impaneling of a fair and impartial jury through questions which permit the intelligent exercise of challenges by counsel." United States v. Anderson, 562 F.2d 394, 398 (6th Cir. 1977) (footnote omitted); United States v. Blount, 479 F.2d 650, 651 (6th Cir. 1973). A trial court commits reversible error if, by unduly restricting voir dire, it substantially impairs the peremptory challenge right. See Swain v. Alabama, 380 U.S. 202, 219, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965); Blount, supra, 479 F.2d at 651; United States v. Rucker, 557 F.2d 1046, 1048–49 (4th Cir. 1977). Where veniremen have been exposed to prejudicial publicity, the nature and degree of that exposure is certainly a matter of legitimate concern to a defense attorney in deciding on peremptory challenges.

■ The peremptory challenge right is limited, however, by the need for expedition and orderly procedure in criminal cases. Under the federal rules, the trial judge is given broad discretion in conduct of the voir dire. Federal Rule of Criminal Procedure 24(a); Anderson, supra, 562 F.2d at 397. Although this discretion is limited by the "essential demands of fairness," Aldridge v. United States, 283 U.S. 308, 310, 51 S.Ct. 470, 75 L.Ed. 1054 (1931), trial courts can ordinarily restrict voir dire on the subject of pretrial publicity to the questioning of veniremen on the sources and intensity of exposure and the juror's ability to disregard the publicity in reaching a verdict. See

14. The trial judge did not permit counsel to question prospective jurors. This procedure is permissible under Federal Rule of Criminal Procedure 24(a).

15. Of the jurors ultimately selected for the panel, only five indicated any prior knowledge of the case. Appellants had one unused peremptory challenge when the jury was impaneled.

16. Appellants cannot argue that further questioning was necessary to facilitate challenges for cause. Where a venireman can lay aside any preconceptions about the case and try it solely on the evidence presented in court, excuse of the venireman for cause is not required. United States v. Gay, 522 F.2d 429, 432 (6th Cir. 1975). See Part 2, supra.

*United States v. Haldeman, supra,* 181 U.S. App.D.C. at 291–293, 559 F.2d at 68–70. Questioning of jurors as to what they "remember" about the case offers no guarantee of useful information and can often lead to needlessly protracted voir dire. *See id.* at 68. Only where defense counsel produces evidence of a specific publication with clear prejudicial potential need a trial court consider asking "content" [17] questions, and then only if the nature of juror exposure to the prejudicial material is not apparent from responses to the more general questions that ordinarily suffice. *See generally United States v. Robinson,* 154 U.S.App. D.C. 265, 270, 475 F.2d 376, 381 (1973); *Haldeman, supra,* 181 U.S.App.D.C. at 292 n.54, 559 F.2d at 69 n.54; Note, 27 Stan.L. Rev. 1493, 1515–21 (1975).

In this case, the requests by defense counsel at trial for further questioning of veniremen related to pretrial publicity generally and not to whether jurors recalled any specific matters.[18] The record of the voir dire contains neither newspaper articles nor any description of other publicity relating to the case. In the absence of a clear foundation for inquiring into juror recollection of particular prejudicial matter, the trial judge was justified in refusing to ask content questions. *See Robinson, supra,* 154 U.S.App.D.C. at 270, 475 F.2d at 381. *Cf. Ham v. South Carolina,* 409 U.S. 524, 528 n.4, 93 S.Ct. 848, 35 L.Ed.2d 46 (1973); *United States v. Giacalone,* 574 F.2d 328, 334–35 (6th Cir. 1978).

In a joint appendix filed with this court by the United States and appellant Jimmy Jackson in the appeal from the third trial there appear at least three newspaper articles that were apparently seen by some veniremen. App. 53–55. All three articles contain references to the firebombings that led to the first mistrial and to the fact that appellant Clyde Johnson had been indicted on state charges for the murder of Cicero Johnson, who was to have been a defendant in this case. We agree that such references had clear prejudicial potential for the defendants. Upon review of the articles in their entirety, however, we conclude that knowledge of juror exposure to them would provide defense counsel with sufficient information to intelligently exercise peremptory challenges, without additional questioning as to what jurors remembered about the reports. Two of the articles are reports of the mistrial, and both of these contain prominent headlines stating that the mistrial followed the firebombings. Both articles also contain references to the murder indictment. The third article concerns the calling of prospective jurors for the second trial, and is only nine paragraphs long. The firebombing and murder indictment are discussed in two of the longer paragraphs. Although the articles also contain general descriptive material, the prominence of the prejudicial material in all three provided fair warning to counsel that jurors who admitted having read them had been exposed to such material and probably remembered it.[19]

---

**17.** A "content" question is a request that the venireman recite everything he remembers about the topic of inquiry. In this context, he would be asked what in particular he remembered about the specific article in question. Obviously, such questioning would have to take place out of the presence of the other prospective jurors, and would be limited to those who initially indicated that they had seen the article.

**18.** The trial transcript indicates that several attorneys submitted written questions for the voir dire, which the trial judge refused to ask. *See* Tr. 130, 233. Although these questions were apparently submitted for the record, they do not appear in the record transmitted to this Court, and we thus do not have occasion to

consider them. *See Ham v. South Carolina,* 409 U.S. 524, 528, 93 S.Ct. 848, 35 L.Ed.2d 46 (1973). It is the responsibility of appellants to insure inclusion in the record of all trial materials upon which they intend to rely on appeal. *See Drybrough v. Ware,* 111 F.2d 548, 550 (6th Cir. 1940); Federal Rules of Appellate Procedure 10(e) & 11(a); 9 J. Moore, Moore's Federal Practice ¶ 210.03 at 1608–10; ¶ 211.05 at 1811–12 (2d Ed.).

**19.** Although not required under the facts of this case, the better practice is for the court to ask content questions of any juror who has been exposed to pretrial publicity which the court knows to be of clear prejudicial potential. *Cf. Nebraska Press Assn. v. Stuart,* 427 U.S. 539, 602, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976) (Bren-

Appellants raise several additional objections to the adequacy of the voir dire, none of which have substantial merit. We have reviewed the entire voir dire transcript and conclude that the procedures followed and the questions asked were sufficient to ensure selection of a fair and impartial jury.

#### 4. Transcript

Freeman Monger and Jimmy Jackson have argued that they were denied due process when, during the third trial, the district court refused their request for a free transcript of the testimony of a government witness (Taylor) at the second trial. The request for the transcript was not made until well into the third trial during the cross-examination of Taylor. The district court denied the request as being untimely since preparation of the transcript would have interrupted the trial for approximately two days.

It is well settled that an indigent criminal defendant is entitled to a transcript of prior proceedings, at the government's expense, if it is reasonably necessary to present an effective defense at the subsequent proceeding. The right is both statutory, 18 U.S.C. § 3006A(e)(1), and constitutional, *Britt v. North Carolina*, 404 U.S. 226, 92 S.Ct. 431, 30 L.Ed.2d 400 (1971); *see also Bounds v. Smith*, 430 U.S. 817, 822 n.8, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977). The requirement of indigency alone resolves the claim of Freeman Monger since he was never determined to be indigent and he had retained counsel. The case is different, though, for Jimmy Jackson, who was determined to be indigent and had court-appointed counsel. As to Jackson, we are willing to assume that the transcript was reasonably necessary for an effective defense at the third trial and that there was no adequate alternative available so as to bring this case within the "adequate alternative exception" to the general rule outlined in *Britt. Cf. United States v. Mullen*, 550 F.2d 373 (6th Cir. 1977); *Martin v. Rose*, 525 F.2d 111 (6th Cir. 1975).

We believe, however, that the district court did not err in refusing to grant the request for a transcript, coming as it did in the midst of the third trial. In all of the cases relied upon by Jackson the requests for transcripts were made before trial.[20] The request for the transcript should have been made before trial or at least well before Taylor testified, absent some showing of good cause for delay. See *United States v. Patterson*, 438 F.2d 328, 329 (5th Cir. 1971) (18 U.S.C. § 3006A(e) right to court-appointed psychiatrist waived by failure to make timely request or motion), and cases cited therein. *See also United States v. White*, 451 F.2d 1225, 1226 (6th Cir. 1971) (no error in refusing to replace court-appointed attorney on eve of trial), and cases cited therein.

#### 5. Juror Notes

William Morrow has argued that the district court committed reversible error in permitting the jurors in the second trial to take notes, particularly since they began during the direct examination of the government's second witness and not at the outset of the trial. The district court permitted the note-taking to commence at that point at the request of one juror on behalf of several jurors. The judge instructed the jury that each juror's notes were for his or her personal use only and the notes were kept in separate envelopes during recesses.

It is within the sound discretion of the trial judge to allow the jury to take notes during the course of a trial and to use them during deliberations. *United States v. Anthony*, 565 F.2d 533, 536 (8th Cir. 1977), *cert. den.* 434 U.S. 1079, 98 S.Ct. 1274, 55 L.Ed.2d 787 (1978); *United States v. Bertolotti*, 529 F.2d 149, 159–60 (2d Cir.

nan, J., concurring); *United States v. Bear Runner*, 502 F.2d 908, 912–13 (8th Cir. 1974).

**20.** *United States v. Jonas*, 540 F.2d 566 (7th Cir. 1976); *United States v. Young*, 472 F.2d 628 (6th Cir. 1972); *Peterson v. United States*, 351 F.2d 606 (9th Cir. 1965).

*See also United States v. Mullen*, 550 F.2d 373 (6th Cir. 1977); *Martin v. Rose*, 525 F.2d 111 (6th Cir. 1975); and *United States v. Tate*, 419 F.2d 131 (6th Cir. 1969).

1975); *United States v. Braverman*, 522
F.2d 218, 224 (7th Cir.), *cert. den.* 423 U.S.
985, 96 S.Ct. 392, 46 L.Ed.2d 302 (1975);
*United States v. Murray*, 492 F.2d 178, 193
(9th Cir. 1973), *cert. den.* 419 U.S. 942, 95
S.Ct. 210, 42 L.Ed.2d 166 (1974); *United
States v. Marquez*, 449 F.2d 89, 93 (2d Cir.
1971), *cert. den.* 405 U.S. 963, 92 S.Ct. 1173,
31 L.Ed.2d 239 (1972); *United States v.
Pollack*, 433 F.2d 967 (5th Cir. 1970); *Toles
v. United States*, 308 F.2d 590, 594 (9th Cir.
1962), *cert. den.* 375 U.S. 836, 84 S.Ct. 79, 11
L.Ed.2d 66 (1963); *Harris v. United States*,
261 F.2d 792, 796 (9th Cir. 1958), *cert. den.*
360 U.S. 933, 79 S.Ct. 1446, 3 L.Ed.2d 1546
(1959); *United States v. Chiarella*, 184 F.2d
903, 907 (2d Cir. 1950), *modified on other
grounds*, 187 F.2d 12 (2d Cir.), *vacated and
remanded on other grounds*, 341 U.S. 946,
71 S.Ct. 1004, 95 L.Ed. 1370 (1951). *See
also* The Jury System in the Federal Courts,
26 F.R.D. 409, 424, 457–59 (1960).

We see no abuse of that discretion
here. Note taking was particularly appro-
priate in the instant case, with numerous
defendants charged in a multicount indict-
ment.

All other issues raised by appellants have
been reviewed and found to be without
merit.

The judgments are affirmed.